[Civ. No. 29674. First Dist., Div. Four. Mar. 14, 1972.]

NATIONAL EXHIBITION COMPANY, Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

2

## COUNSEL

Sullivan, Roche & Johnson, Vincent J. Mullins and Gerald J. O'Connor for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, Robert A. Kenealey, Deputy City Attorney, Orrick Herrington, Rowley & Sutcliffe, William H. Orrick, Jr., Willoughby C. Johnson and William F. Alderman for Defendants and Respondents.

## OPINION

**BRAY, J.**[*]—Appellant appeals from summary judgment of the San Francisco Superior Court in favor of respondents.

### Questions Presented

1. Are there any issues of fact?

2. Is the stadium operator admission tax imposed on appellant in violation of the city's agreements with the Giants?

3. Did the trial court err in dismissing the complaint?

### Record

Appellant[1] filed a complaint against respondents City and County of San Francisco, its recreation and park commission and San Francisco Stadium, Inc., seeking declaratory and injunctive relief. The complaint alleged: (1) Respondents, in order to procure a major league baseball team

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Appellant, the National Exhibition Company, is the San Francisco Giants Baseball Club and will be referred to hereinafter as the Giants.

to operate within its confines, enticed the Giants to move to San Francisco, one of the inducements being the unqualified promise to build and maintain, entirely at its cost, a first class, multi-purpose stadium. (2) The Giants, placing their full faith and trust in the words, promises, and commitments of respondents, moved to San Francisco, investing substantial sums of money in the move and undertaking to perform their part of a lease agreement entered into by the Giants. (3) The lease, among other things, provides in paragraph 16 that changes and improvements in the building are to be made at the landlord's expense, and not at the expense of the tenant, unless the changes are requested by them. (4) In 1967, respondents determined that they would make the basic changes to Candlestick Park so that it could be used by other tenants after the baseball season. (5) Since such changes would not benefit the Giants, it was agreed in writing that the improvements would be at no cost or expense to it. (6) Respondents, in violation of the above agreement, have undertaken to compel the Giants to pay large sums of money for the basic changes to the building. (7) If required to make such payments, the Giants would be compelled to raise admission prices by approximately 17 percent.

Respondents moved for summary judgment, on the ground that the complaint did not present any triable issue of fact and had no merit. The motions were heard on declarations and depositions of the parties and other written material. The motions were granted and, after denial of the Giants' motion for reconsideration, judgment was entered in favor of respondents.[2]

*Facts*

In 1954 the city determined that it would be in the public interest to provide a stadium for the exhibition of athletic events, including baseball, and to have a National League baseball team domiciled in San Francisco. To that end the city incurred a bonded indebtedness of $5,000,000, caused San Francisco Stadium, Inc. (hereinafter "Stadium") to be incorporated to finance the balance of the cost of the stadium and invited appellant to relocate the Giants baseball team from New York to San Francisco. Stadium was incorporated in September 1957 as a corporation not organized for profit and thereafter issued $6,025,000 revenue bonds. Candlestick Park stadium was constructed and completed by Stadium and leased by Stadium to the Giants under the terms of the Stadium lease, executed on March 15, 1958. This lease, assigned by Stadium to the city, is still in effect. Certain additions to Candlestick Park, such as artificial turf, installation of new

---

[2]The Giants' petition for writ of mandate was denied by this court on January 22, 1971, and a petition for hearing by the Supreme Court was denied on February 17.

and additional seats, and other improvements, were made and, at the time of the hearing herein, were being made from receipts from bonds issued and sold by Stadium. Giants is the operator of athletic events in Candlestick Park stadium. The sole contractual relationship of the city with the Giants is the stadium lease, except that the Giants contend that certain documents hereinafter mentioned constitute additional agreements which, added to the provisions of section 9 of the stadium lease, prohibit the application to the Giants of the tax provided for by Ordinance 356-70 of the City and County of San Francisco adopted October 30, 1970. This ordinance, to be supervised by the city's tax collector, imposes an admission tax on any operator of athletic contests in an amount of $.50 on each admission ticket sold in any stadium located in the city.

Other than the question of whether any issue of fact was raised in this action, the controversy between the parties is in essence as stated by the trial court: "That contrary to the provisions of the lease under which the plaintiff (San Francisco Giants) holds possession of Candlestick Park and contrary to other alleged representations and agreements the defendants are seeking without legal right to compel the Giants to pay for certain changes, improvements and alterations intended to make the Park more suitable for the staging of professional football games." The factual basis for the Giants' claim is that the tax imposed on tickets by Ordinance 356-70 compels the Giants indirectly to pay for such improvements, in violation of their agreements and understanding with respondents.

## 1. *Are there issues of fact?*

The rules concerning summary judgment are so well established that it hardly seems necessary to mention them. ■ "The issue upon a motion for summary judgment is whether the moving party's affidavit states facts which, if proved, would support a judgment in his favor. Where the defendant is the moving party, he must set forth with particularity competent evidentiary facts sufficient to establish every element necessary to sustain a judgment in his favor." (*Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 171 [76 Cal.Rptr. 680].) ■ "Only if the affidavits of the moving party, considered in the light of the issues raised by his pleadings, together with the admissions and affirmative allegations set forth in the pleadings of the adverse party would, standing alone, support the motion for summary judgment does the court look to the counteraffidavits, if any." (*Id.* at p. 172.) ■ If it appears from the showings made in support of and in opposition to a motion for summary judgment that no triable issue of fact exists, and that affidavits in support of a motion

6

state facts which, if proved, would support a judgment in favor of the moving party, summary judgment is proper. (*Terrell* v. *Local Lodge 758, etc., Machinists* (1957) 150 Cal.App.2d 24, 26 [309 P.2d 130].)

■ An examination of the record fails to show (with one exception, hereinafter discussed)[3] that any issue of fact was raised by the showing made by both parties at the hearing. As stated by the trial judge in his opinion, "There is, therefore, no dispute as to the facts but rather a dispute as to the legal effect of the facts agreed upon and as to the interpretation of the various documents before the court on this Motion." There is no denial of the existence of the agreements, documents, letters, etc. (except as to the Browne letter) presented by the parties, nor of what is stated therein. The question before this court is whether the trial court correctly adjudged the legal effect of the lease and ordinance imposing the admissions tax. As the correctness of its judgment must be determined from the face of these documents, this court is not bound by the trial court's determination but must make its own determination of their legal effect.

The court in its opinion stated that the Giants' claim, that the tax is a violation of the terms of Mayor Christopher's invitation to come to San Francisco, is untenable because the lease signed by the Giants clearly states that it is the "sole and entire agreement between the parties." There is no substantial difference between the Christopher letter and the March agreement in the respect that both provided that improvements to be made to the stadium would be without cost to the Giants. So it is immaterial whether the formal agreement constituted a novation of the Christopher agreement, assuming that his letter could bind the city.

2. *Does the tax violate the agreement in the lease?*

The lease executed by Stadium to the Giants is dated March 15, 1958. The clause upon which the Giants rely is section 16, which in pertinent part states: "The Tenant, however, shall not be obligated to make alterations or improvements, structural or otherwise, that may at any time hereafter be required by any such law, rule, requirement, order, direction, ordinance or regulation and the Landlord shall make provision with the Commission for the making of all alterations or improvements (except alterations and improvements to additions, betterments and improvements made by, or at the direction of, the Tenant) so that the Commission shall be obligated to make the same without cost to the Tenant."

On August 6, 1957, then Mayor George Christopher and Francis Mc-

---

[3]Whether the Alan K. Browne letter was ever delivered to the Giants.

■

Carty, supervisor and member of the finance committee, wrote to Mr. Horace Stoneham, president of the Giants, inviting him to bring the Giants to San Francisco and promising the building and furnishing of a stadium for their exclusive occupancy during the baseball season. (Incidentally, there appears in this letter no statement to the effect that the Giants would not be required to pay for any changes, alterations or improvements in the stadium.)

John F. Shelley, Mayor of San Francisco in 1967, declared that in that spring he agreed with Mr. Stoneham that alterations to Candlestick Park to enable the 49ers to play there would be made at no cost to the Giants and that, if attendance at Giants games increased as a result of the alterations, the Giants would pay an increased rental, this agreement to be carried out through Stadium. Horace Stoneham by declaration corroborated Mr. Shelley's statement concerning the alterations to be made at no cost to the Giants.

The declaration of Charles S. Feeney likewise corroborated Mr. Shelley's statement and stated that the agreement was reduced to writing in a letter from the Giants to Mr. Browne dated March 1967, which was accepted in writing by Mr. Alan Browne, President of Stadium, which agreement the Giants relied upon and which has never been repudiated by Stadium.

Mr. Browne, by deposition, admitted signing the letter on behalf of Stadium. This letter referred to the proposed alterations to be made at Candlestick Park, "all at no cost or expense to" the Giants.[4]

In view of the statements in the lease that it is the "sole and entire agreement between the parties," and that all improvements shall be made without cost to the tenant, the trial court apparently deemed it unnecessary to determine the legal question as to whether the city could be legally bound by promises of the mayor and the others who invited the Giants to San Francisco.

It is clear from the uncontradicted evidence that, under the lease with Stadium, the Giants cannot be required to pay for any portion of the alterations or improvements to Candlestick Park stadium. The trial court

[4]The court found that this letter, although signed by Browne, was never delivered to the Giants and that it remained in the hands of Browne's attorney to await further negotiations. The fact that a copy signed by both sides is in appellant's hands would cause an issue of fact. However, it is not important as the lease provides that the Giants are to bear no part of the cost of the alterations. Again, as stated by the trial court, the real question in the case is whether the imposition of the operator's admission tax violates the agreement that the Giants are to pay no part of the cost of the alterations to the stadium.

**8**

did not find otherwise. While the court made no direct finding on the subject, it clearly appears from its opinion that it assumed that the Giants could not be charged for the improvements; therefore its entire determination is that the imposition of the operator's admission tax in no way causes the Giants to pay for the improvements. The court stated: "It is noted that whereas the tax is imposed on the operator the ordinance also provides that the amount of the tax to be paid shall be printed on each admission ticket with the price at which the ticket is sold (Sec. 806) and that the tax imposed shall be held in trust by the operator until paid to the tax collector. . . . It is clear from this that the intent of the ordinance is that the purchaser of the ticket pays the tax or, at least, that the operator is authorized to pass the tax on to the buyer. The court must conclude from the foregoing that the fans of the Giants, and not the Giants, are being made to pay this tax for improvements. Plaintiff has cited no legal authority warranting any other conclusion. Furthermore, the imposition of an admissions tax should not be considered as directly or indirectly in violation of any agreement under which plaintiff holds possession of the Park since the lease, in express words, contemplates a City and County admissions tax (Lease, p. 12). Before passing from this subject, one further point should be noted: it is undisputed (see deposition of Alan K. Browne, offered in evidence by plaintiff) that the completed improvements and the only known contemplated improvements were paid for and will be paid for by the proceeds of bonds issued and to be issued by defendant, Stadium, Inc., and that no part of said improvements have been paid for by, or will be billed to, plaintiff, the National Exhibition Company. The fact that the corporation will pay the principal and interest due on these bonds from rentals received from the [Giants] as lessee of the Stadium is of no significant legal value to the plaintiff, National Exhibition Company, even though the uncontradicted evidence is that at least a portion of these rentals will be raised by the admissions tax in question. As indicated above, the ultimate burden of payment, if it is legally pertinent to trace its source in such detail, is on the patron[s] of the Stadium, not upon the operator."

There is nothing in the lease nor in the relationship of the parties to the effect that the city may not impose a tax on the admission tickets.

Ordinance 356-70 is headed "Ordinance amending Part 111 of the Municipal Code by adding Article 11 thereto, imposing a Stadium Operator Admission Tax on persons operating athletic contests, exhibitions and other special events in any stadium; . . . ."

Section 803 of the ordinance provides that the operator "shall hold the

tax imposed in Section 802 hereof in trust until the same is paid to the Tax Collector as hereinafter provided."

Section 841 of the ordinance provides for all moneys received from the tax to be deposited in a Stadium Operator Admission Tax Fund. "Said fund shall be used solely for the following purposes: . . . (3) Effective July 1, 1971, appropriating funds for base rental and additional base rental as provided for in the Amended Park Lease and Supplemental Amended Park Lease between City and County and San Francisco Stadium, Inc. for the Improvement and Expansion of the Recreation Center located at Candlestick Park."

The trial judge stated in his opinion that the proceeds of the tax in question are "ordained to be used exclusively for the improvements aforementioned,"—those to the stadium.

The deposition of Alan Browne, offered in evidence by the Giants, states that the improvements at Candlestick stadium were paid for and will be paid for by the proceeds of bonds issued and to be issued by Stadium, and that no part of said improvements have been paid for by, or will be billed to, the Giants.

Obviously, the bonds will have to be paid for. It appears from section 841 of the ordinance that the tax moneys are to be used with the rentals to pay off the bonds.

■ The construction to be given a municipal ordinance is generally a question of law. (*Welshans* v. *City of Santa Barbara* (1962) 205 Cal. App.2d 304, 308 [23 Cal.Rptr. 108].) ■ Respondents call the tax an "admissions tax" and state that the lease contemplates an admissions tax, referring to the recital in section 9, page 12, of the lease which, after providing that the rental could be "a sum equal to five per cent (5%) of paid admissions," defines "paid admissions" as the gross amount paid for admissions, or the right to admissions, after deducting "Federal, State, City and County or other *admission* taxes, *paid on or by reason of admissions* or *the right to admissions.*" (Italics added.) The trial court held that this clause contemplates the imposition of the operator's admission tax. The facts that, under the ordinance, section 806, the amount of the tax must be printed on the admission ticket, the ticket purchaser is to pay the tax, and the operator must hold the tax in trust, indicate that it is the intent of the ordinance that the purchaser must pay the tax. Thus the Giants are not paying for the stadium improvements because the tax moneys and rentals pay the bonds.

Summing up, there are no factual issues in this case other than the one

beforementioned, the determination of which is not necessary to a decision of the case. The city and Stadium have agreed with the Giants that the latter shall not be required to pay the cost of any improvements or alterations to Candlestick Park stadium. The question to be determined is whether the operator admission tax imposed by Ordinance 356-70 violates said agreement in that it imposes on the Giants any of the costs of said improvements. This, in turn, depends upon whether the intent of the ordinance imposing the tax is that the payment of the tax which is to be used to pay the bonds, the moneys from which have paid and are paying the costs of said improvements, is to be by the patrons of the stadium or by the Giants.

As stated, the Giants collect the tax, hold it in trust, and then pay it to the fund out of which the bonds will be paid. Otherwise what becomes of the tax the fans have paid on their admission tickets? If the Giants should be required to pay their own moneys to the fund, would they not be reimbursed by the tax paid by the fans? Also, how could the Giants know how much to pay into the fund until the fans bought their tickets and had paid the tax?

The proper interpretation of the ordinance providing for the tax, in spite of the designation of the tax as "Operator Admission Tax," is that the Giants are merely the collector of the tax paid by the patrons.

3. *No error in dismissal of complaint.*

The Giants contend that in a declaratory relief action, the parties are entitled to a declaration of their rights, even if it be unfavorable and, therefore, the trial court erred in dismissing the complaint. The Giants rely upon *Maguire* v. *Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719 [146 P.2d 673, 151 A.L.R. 1062], where the trial court dismissed the complaints for declaratory relief on the ground that they failed to show on their faces that the plaintiffs were entitled to the relief sought. The reviewing court stated: "And it has been held that where the plaintiff is not entitled to a favorable declaration, the court should render a judgment embodying such determination and should not merely dismiss the action." (23 Cal.2d at p. 729.)

Here the court did not "merely" dismiss the action; it declared the rights of the parties in holding that the tax is really one imposed on the stadium patrons and not on the·Giants, and that the imposition of the tax in nowise violated its lease. ■ Section 437c of the Code of Civil Procedure, dealing with summary judgments, provides in pertinent part: "[I]f it is claimed that the action has no merit . . . on motion of either party . . . supported by affidavit of any person or persons having knowledge of the facts . . . the complaint may be dismissed. . . . The word 'action' as used in

this section shall be construed to include all types of proceedings." This sentence was added in 1953. As said in *Walker* v. *Munro* (1960) 178 Cal. App.2d 67, 70 [2 Cal.Rptr. 737], "Viewed in the light of the gradual expansion of actions to which summary proceedings [are] applicable [referring to Statutes of 1933, 1953, 1957], it is apparent that section 437c was intended to include declaratory relief actions in a proper case." (See also *Spencer* v. *Hibernia Bank* (1960) 186 Cal.App.2d 702, 712 [9 Cal.Rptr. 867].) In *Griffith* v. *Dept. of Public Works* (1959) 52 Cal.2d 848, 854 [345 P.2d 469], the granting of a summary judgment in a declaratory relief action was upheld.

The court did not err in granting summary judgment.

Judgment affirmed.

Devine, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied April 11, 1972, and appellant's petition for a hearing by the Supreme Court was denied May 10, 1972.